

FILED by _____ D.C.

FEB 2 5 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF FLORIDA

......................................................

NEPTUNE INDUSTRIES, INC.,　　　　　)
ERNEST PAPADOYIANIS,　　　　　　　)
XAVIER T. CHERCH, JOSEPH　　　　　)
AMELLIO, DARRIN AMELLIO,　　　　　)
OLDEMAR PAGES, GERMAN　　　　　　)
GONZALEZ,  GABRIEL and PILAR　　　)
CHAVES, CARLOS AND  DORIS ROSSI, )
STEPPING STONES PARTNERS, LP,　　)
JAN ARNETT, DONALD J. WEISS,　　　)
ALBERTA MANAGEMENT, INC.,　　　　)
HILLOCK HOLDING COMPANY, INC.　　)
MARCON DEVELOPMENT CORP., and　)
LANDA FINANCIAL GROUP　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
Vs.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
ARMEN HOVNANIAN; ARMS'　　　　　)
LENGTH FISHERIES, LLC; DAWSON　)
JAMES SECURITIES, INC.;　　　　　　)
NEWBRIDGE SECURITIES　　　　　　　)
CORPORATION; GERARD MICHAEL　　)
JOUBERT; TOM FOX; DAVID　　　　　)
WEINSTEIN; STEVE CARBONE;　　　　)
SOUTHEASTERN ASSOCIATES;　　　　)
SANDOR CAPITAL MASTER FUND,　　)
LP;  JOHN LEMAK; LARRY LEE;　　　)
CHARLES E. LANDAHL, JR.;　　　　　)
and JOHN DOES 1 THROUGH 25,　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants,　　　　　　　)
......................................................)

# 09-80297

Civil Action File No. _____

# CIV-MARRA

MAGISTRATE JUDGE
JOHNSON

## COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

PLAINTIFFS, as and for their Complaint against DEFENDANTS, jointly and severally, allege and state as follows:

1

## PARTIES

1.  Neptune industries, Inc.  ("Neptune") is a Florida corporation with its principal offices located in Boca Raton, Florida. Neptune is a publicly traded company and is a reporting company under Section 12(g) of the Securities and Exchange Act of 1934.

2.  Ernest Papadoyianis  ("Papadoyianis") is an individual resident of Boca Raton, Florida and is President and Chief Executive Officer of Neptune and a shareholder and creditor of Neptune.

3.  Xavier T. Cherch ("Cherch") is an individual resident of Delray Beach, Florida and is Chief Operating Officer, Secretary and Treasurer of Neptune. and a shareholder and creditor of Neptune.  Papadoyianis and Cherch are sometimes herein referred to collectively as the "Officer Plaintiffs".

4.  Joseph Amellio and Darrin Amellio ("Amellio") are individual residents of Florida and are shareholders of Neptune as a result of the purchase of certain convertible debenture bonds issued by Neptune in 2007, the conversion of those bonds into common stock and the receipt of additional shares of common stock as interest on the bonds.

5.  Oldemar Pages ("Pages") is an individual resident of New York and a shareholder of Neptune as a result of the purchase of certain convertible debenture bonds issued by Neptune in 2007, the conversion of those bonds into common stock and the receipt of additional shares of common stock as interest on the bonds.

6.  German Gonzalez ("Gonzalez") is an individual resident of Florida and a shareholder of Neptune as a result of the purchase of certain convertible debenture bonds issued by Neptune in 2007, the conversion of those bonds into common stock and the receipt of additional shares of common stock as interest on the bonds.

7.     Carlos and Doris Rossi ("Rossi") are individual residents of Florida and shareholders of Neptune as a result of the purchase of certain convertible debenture bonds issued by Neptune in 2007, the conversion of those bonds into common stock and the receipt of additional shares of common stock as interest on the bonds.

8.     Gonzalez, Chaves, Pages, Amellio and Rossi are sometimes herein referred to collectively as the "Convertible Debenture Bond Investors".

9.     Stepping Stones Partners, LP ("Stepping Stones") is a New York limited liability company which has invested in Neptune over a period of several years and is currently a creditor of Neptune in the amount of $120,400 plus accrued interest, and is also a shareholder of Neptune.

10.    Jan Arnett ("Arnett") is an individual resident of the State of New York who has invested in Neptune over a period of several years and is currently a creditor of Neptune in the amount of $108,813 plus accrued interest, and is also a shareholder of Neptune.

11.    Alberta Management, Inc. ("Alberta") is a Connecticut corporation which has invested in Neptune over a period of several years and is currently a creditor of Neptune in the amount of $200,000, plus accrued interest, and is also a shareholder of Neptune.

12.    Jan Arnett ("Arnett") is an individual resident of the State of New York who has invested in Neptune over a period of several years and is currently a creditor of Neptune in the amount of $108,813 plus accrued interest, and is also a shareholder of Neptune.

13.    Donald J. Weiss ("Weiss") is an individual resident of the State of Pennsylvania who has invested in Neptune over a period of several years and is currently a creditor of Neptune in the amount of $60,000 plus accrued interest, and is also a shareholder of Neptune.

14. Hillock Holding Company, Inc. ("Hillock") is a Pennsylvania corporation which has invested in Neptune over a period of several years and is currently a creditor of Neptune in the amount of $150,000, plus accrued interest, and is also a shareholder of Neptune

15. Marcon Development Corp. ("Marcon") is a Florida corporation which has invested in Neptune over a period of several years and is currently a creditor of Neptune in the amount of $44,944, plus accrued interest, and is also a shareholder of Neptune.

16. Landa Financial Group. ("Landa") is a Florida corporation which has invested in Neptune over a period of several years and is currently a creditor of Neptune in the amount of $44,944, plus accrued interest, and is also a shareholder of Neptune.

17. Stepping Stones, Arnett, Alberta, Weiss, Hillock, Marcon and Landa are sometimes herein referred to collectively as the "Convertible Note Investors".

18. Armen Hovnanian ("Hovnanian") is an individual resident of Fort Lauderdale, Florida and of N the State of New Jersey and is the sole member of Arms Length Fisheries, LLC, ("ALF"), a Florida limited liability company with its principal offices located in Fort Lauderdale, Florida. Hovnanian and ALF may be served at 757 Southeast 17th Street, Suite 110, Fort Lauderdale, FL 33316.

19. Sandor Master Capital Fund LP ("Sandor") is a Texas limited partnership with its principal offices located in Dallas, Texas. John Lemak is an individual resident of Dallas, Texas, and is general partner of Sandor. Sandor and Lemak may be served at 2828 Routh Street, Suite 500, Dallas, TX 75201.

20. Charles E. Landahl, Jr.("Landahl") is an individual resident of Colorado and maybe served at 1195 Saratoga Avenue, Steamboat Springs, CO 80477

4

21. Gerard Michael Joubert ("Joubert") is an individual resident of Homestead, Florida, and is a former executive officer of Neptune until terminated for cause. Joubert may be served at 1781 SE 20th Road, Homestead, Florida 33035.

22. Tom Fox ("Fox") is an individual resident of Florida and is an employee, officer and agent of Defendant Newbridge Securities Corporation. and formerly was an employee, officer and agent of Defendant Dawson James Securities, Inc. Fox may be served at his office address at 1451 W. Cypress Creek Road, Suite 204, Ft. Lauderdale, Florida 33309.

23. Newbridge Securities Corporation ("Newbridge") is a Florida corporation with its principal offices located at 1451 W. Cypress Creek Road, Suite 204, Ft. Lauderdale, Florida 33309. Newbridge is a broker dealer and investment bank regulated by the Financial Industry Regulatory Authority ("FINRA") and the United States Securities & Exchange Commission. Newbridge may be served by service on its registered agent, Gregg J. Breitbart, 1451 W. Cypress Creek Road, Suite 204, Ft. Lauderdale, Florida 33309.

24. David Weinstein ("Weinstein") is an individual resident of Florida and is an employee, officer and agent of Defendant Dawson James Securities, Inc. Weinstein may be served at his office address, 925 S. Federal Highway, Suite 600, Boca Raton, Florida 33432.

25. Dawson James Securities, Inc. ("Dawson James") is a Florida corporation with its principal offices located at 925 S. Federal Highway, Suite 600, Boca Raton, Florida 33432. Dawson James is a broker dealer and investment bank regulated by the Financial Industry Regulatory Authority ("FINRA") and the United States Securities & Exchange Commission. Dawson James may be served by service on its registered agent, Albert J. Poliak, 925 S. Federal Highway, Suite 600, Boca Raton, Florida 33432.

26. Larry Lee is an individual resident of Florida and may be served at 103 Ocean Bay Drive, Key Largo, Florida 33037.

27. Steve Carbone "(Carbone")" is an individual resident of Florida and the sole owner or member of Southeastern Associates ("Southeastern"). Carbone and Southeastern may be served at 353 Sunset Drive, Suite 5, Ft. Lauderdale, Florida 33301.

28. John Does 1 through 25 are persons, corporations or other entities not presently known to Plaintiffs, who advised, aided abetted, conspired with and/or assisted or consulted with all or some of the Defendants in the plans schemes, devises, artifices, and fraudulent actions alleged herein, including lawyers, accounts, advisers, consultants and employees and officers of Defendants Dawson James and Newbridge, whose identities will be determined in the discovery proceedings in this case, but on information and belief may include Greenberg Traurig, P.A., its partners, members, employees and affiliates; John Mayersohn and Roetzel & Andress, its partners, members, employees and affiliates.

## JURISDICTION AND VENUE

29. Jurisdiction is appropriate in this Court under the provisions of 28 U.S.C. § 1331 in that the Complaint assert claims arising under the laws of the United States. Jurisdiction over the claims asserted in the Complaint based upon the laws of the State of Florida is ancillary to the Court's jurisdiction over the federal claims, as all of the claims asserted in the Complaint arise out of a common nexus of fact and law. Venue is proper in this Court under the provisions of 28 U.S.C. §1391(b).

## FACTS

30.    Neptune is a holding company engaged through subsidiaries in fish farming, aquaculture technology development and related matters.  Its common shares are traded on the over the counter (OTC) Bulletin Board under the symbol NPDI.

31.    The remaining Plaintiffs are investors in Neptune.

32.    The Defendants, acting jointly and severally, are investors in and advisors to Neptune, or have conspired and joined with other Defendants, who have engaged in, devised and operated a scheme, plan, and artifice, conspiracy and other illegal, improper and unlawful acts, practices and courses of conduct for the purpose of destroying the business, operations, prospects, stock price, funding opportunities, business opportunities and other assets and  properties of Neptune, to the detriment of Neptune, its shareholders and creditors, including the other Plaintiffs, with the intent, plan, and desire to obtain for their own benefit the business and technology of Neptune and its subsidiaries, including the fish farming operation in Florida City, Florida, the Ento Protein® technology owned by a subsidiary of Neptune, and other assets, claims, rights and privileges, all as is more fully set forth in this Complaint.

33.    Neptune owns all of the outstanding stock of BHA Holdings, Inc., a Florida corporation, which in turn is the sole shareholder of Blue Heron Aquaculture, Inc.

34.    Blue Heron Aquaculture, Inc. is a Florida corporation incorporated on December 31, 2007 which manages a fish farm located in Florida City, Florida under a management agreement entered into on May 25, 2001 between Blue Heron Aqua Farms, LLC, a Florida limited liability company, and South Florida Aquaculture, Inc., a Florida corporation (the "Management Agreement").

35.   The Management Agreement was assigned to Blue Heron Aquaculture, Inc. effective January 1, 2008, and Blue Heron Aquaculture, Inc. has managed the farming operation beginning January 1, 2008 to date. The operations of the farm have produced continuous losses and negative cash flow since January 1, 2008.

36.   Prior to January 1, 2008, the fish farm operation in Florida City, Florida was managed by Blue Heron Aqua Farms, LLC under the Management Agreement, and Blue Heron Aqua Farms, LLC generated negative cah flows and losses from the fish farm operation, and never generated a profit or positive cash flow, at any time from the beginning of the Management Agreement in May 25, 2001 through December 31, 2007.

37.   During the period from May 25, 2001 to date, Neptune has provided working capital funds in excess of $2,500,000 to maintain and operate the fish farm operation of, first, Blue Heron Aqua Farms, LLC and thereafter, Blue Heron Aquaculture, Inc.

38.   Blue Heron Aquaculture, Inc. has no ownership or leasehold interest in the property on which the fish farm is operated in Florida City, Florida and is solely manager of the farm under the Management Agreement.

39.   Neptune also has no ownership or leasehold interest in the property on which the fish farm is operated in Florida City, Florida, and is only the sole shareholder of BHA Holdings, Inc., which in turn is the sole shareholder of Blue heron Aquaculture, Inc.

40.   Neptune has obtained working capital funds to support its investment in the fish farm operation of Blue Heron Aqua Farms, LLC and later Blue Heron Aquaculture, Inc. from the other Plaintiffs and other investors over the period from 2001 to the present.

41.   Neptune is the sole shareholder of Aqua Biologics, Inc., a Florida corporation incorporated on August 3, 1998 as Aquaculture Specialties, Inc., and which changed its

name to Aqua Biologics, Inc. on June 3, 2006. Aqua Biologics, Inc. is a technology and development company which owns the rights to the Ento Protein® technology and formerly held the license rights to the Aqua-Sphere® technology until September, 2008.

42. Prior to the incorporation of Neptune on May 11, 2008, Plaintiffs Papadoyianis and Cherch had developed certain closed containment aquaculture technology through their own separate efforts and with their own funds, which technology later became known as Aqua-Sphere®

43. Following the formation of Neptune, Plaintiffs Papadoyianis and Cherch entered into a license agreement with Neptune in June, 1998 (the "First License"), which was approved by the independent members of the Board of Directors of Neptune and later by the shareholders of Neptune,

44. Under the First License, Neptune obtained the license rights to further develop, and sell products and otherwise market the technology in North America only, but with a right of first refusal for other geographic markets. The First License provided for no royalties for the first six license years in order to allow Neptune time to further develop the technology, and with royalties commencing thereafter based on sales, but with a minimum annual royalty of $50,000.

45. Under the First License, Neptune, as called for in the Agreement , also undertook to apply for patent protection for the technology on behalf of the inventors, Papadoyianis and Cherch, as part of Neptune's cost to obtain and maintain the license.

46. Neptune was unable to pay the minimum annual royalties under the First License as they came due, and as of the end of Neptune's fiscal year ended June 30, 2008, Neptune owed Papadoyianis and Cherch a total of $200,000 in accrued minimum royalties.

47.   Neptune did meet its obligation to apply for and pursue patent protection for the technology with the US Patent and Trademark Office in the names of Papadoyianis and Cherch, as the inventors and owners of the technology.

48.   In 2004, Neptune became a reporting company under Section 12(g) of the Securities & Exchange Act of 1934 (15 U.S.C.§78l(g)) and has thereafter filed all required periodic reports on Forms 10-Q and 10-K, as well as Form 8-K, with the United States Securities and Exchange Commission (the "SEC"), fully disclosing the terms and existence of the First License.

49.   In May, 2008, as a result of false, fraudulent and deceptive demands of Defendants Weinstein and Fox, as well as other persons working with and in concert with Defendants, Plaintiffs Papadoyianis Cherch and Neptune undertook a review of the First License, which had an initial term of ten years, through June 30, 2008, and which would renew automatically on the same terms thereafter at the end of June, 2008.

50.   Defendants Weinstein and Fox, as well as other persons working with and in concert with Defendants, represented falsely to Neptune, Papadoyianis and Cherch that Neptune would be unable to obtain additional working capital funding unless and until the Aqua-Sphere® technology was transferred to and owned by Neptune.

51.   Defendants failed and refused to disclose to Neptune, Papadoyianis and Cherch, and intentionally concealed from them, the fact that Weinstein, Fox and Dawson James had falsely represented to the Convertible Debenture Bond Investors and other investors who had purchased the convertible debenture bonds from Neptune through Dawson James that Neptune already "owned" the Aqua-Sphere® technology despite statements to the

contrary in Neptune's offering memorandum, SEC filings and public announcements and contrary to the actual personal knowledge of the Defendants.

52.   Defendants also failed and refused to disclose, and concealed from Plaintiffs, that their plan, scheme and device was to intimidate and coerce Neptune, Papadoyianis and Cherch to transfer ownership of the Aqua-Sphere® technology to Neptune as part of their conspiracy to take control of Neptune's business, properties, assets and technology for their own benefit, and to the detriment of Plaintiffs.

53.   Plaintiffs Papadoyianis and Cherch, in response to and at the insistence of Weinstein for the implementation of a new agreement which Weinstein insisted was the only way Neptune could be funded, retained their own separate personal legal counsel to negotiate a new license agreement for the Aqua-Sphere® technology, and the Board of Directors of Neptune appointed a committee of the independent directors of Neptune, not including Papadoyianis and Cherch, in June 2008 to review, negotiate and agree on a new license agreement for the Aqua-Sphere® technology.

54.   A new worldwide license agreement was negotiated and approved by unanimous vote of the Board of Directors of Neptune, with Cherch and Papadoyianis abstaining from the discussion and vote, and the new license became effective on July 2, 2008 (the "New License"), replacing the First License.

55.   Under the New License, Neptune obtained the exclusive worldwide license to develop, market, produce and sell products using Aqua-Sphere® technology in return for, among other matters, an initial license fee of $200,000, payable in installments, representing the accrued but unpaid license fee under the First License.

56. The New License was entered into to meet the demands and representations of Weinstein, Fox, Newbridge and Dawson James that new working capital funds would not be obtained until and unless Neptune obtained the exclusive worldwide rights to the Aqua-Sphere® technology, and in reliance on the representations of Weinstein, Fox, Newbridge and Dawson James that new working capital funds would be made available once this was accomplished.

57. Notwithstanding the New License and the representations of Defendants, and despite the execution and delivery by Neptune to Weinstein and Dawson James of several placement agent agreements for additional funding of up to $7,000,000, on the terms proposed by Weinstein and Dawson James, Defendants had no intention to provide or seek additional funds for Neptune and instead planned, schemed, conspired and otherwise acted with all Defendants for the purpose of destroying the business of Neptune, the market for its common stock, and the ability of Neptune to obtain working capital funds from other sources, for the purpose of taking and obtaining the technology of Aqua Biologics, Inc., the Aqua-Sphere® technology owned by Papadoyianis and Cherch, and the fish farm managed by Blue Heron Aquaculture, Inc. for their own benefit and use, to the damage and loss of Plaintiffs.

58. As a result of the failure and refusal of Dawson James, Fox, Newbridge and Weinstein, to raise or provide additional working capital funds to Neptune, Neptune was unable to pay the initial license royalty under the New License, or the accrued royalty under the First License, in the amount of $200,000, and as a result, the New License was defaulted and terminated in September 2008.

59.    The termination and default of the New License was publicly disclosed by Neptune, as required by the SEC disclosure rules, on a timely basis.

60.    The default and termination of the New License was thereafter acknowledged and ratified by the independent members of the Neptune Board of Directors at a special meeting of the Board of Directors.

61.    Neptune has no further interest in or right to the Aqua-Sphere® technology, or the use of the names, trademarks and other rights to the Aqua-Sphere® technology, all of which are owned by Papadoyianis and Cherch.

62.    Neptune, after having provided Dawson James with a complete and detailed "due diligence" package,  retained Dawson James. as its investment bank, in March, 2006, through Weinstein, to raise working capital for Neptune for expansion of its current operations through Blue Heron Aqua Farms, LLC and for development and commercialization of AquaSphere® and Ento-Protein® in Aqua Biologics, Inc.

63.    Neptune sought total funding of $7 Million when it met with Dawson James and Weinstein in March 2006, and Dawson James and Weinstein proposed a two part fund-raising effort, the first being a $2 million convertible debenture at 24 percent interest, re-payable in two years, plus warrants to acquire $2 million in common stock for 5 years at 0.50 per share (the "Convertible Debenture Bonds"); and the second, to be an equity offering within 90 days for the remaining $ 5-7 million, to include funds to repay the initial Convertible Debenture Bonds funding, which Dawson James and Weinstein characterized as a "bridge funding".  Due to the toxic and derogatory terms proposed for the Convertible Debenture Bonds, Neptune agreed reluctantly to this proposal and executed a placement agent agreement with Dawson James in March 2006, under which

Dawson James would, and ultimately did, receive a 10 percent commission, a 3 percent unaccountable "expense" allowance, 1,200,000 shares of restricted common stock, and warrants were to purchase 1,808,666 common shares of Neptune at $0.30 per share (less than the warrant price offered to its customers), and 1,085,000 in additional warrants to buy Neptune common stock at $0.50 per share.

64. Furthermore, and as condition to completing the offering, Dawson James, and Weinstein in particular, insisted that it be issued a "consulting agreement" at the rate of $5,000 per month which once again the Company unsuccessfully resisted on the basis that this amounted to additional unnecessary expense, considering the amount of funds being raised would be a significant burden on Neptune.

65. The Convertible Debenture Bonds offering commenced in March 2006 as a private placement of a unit consisting of one debenture and one warrant to purchase common stock at $0.50 per share for each $1.00 invested.

66. Neptune prepared a private placement offering memorandum (the Offering Memorandum") and subscription agreement for use in the Convertible Debenture Bonds offering, with the prior compliance review and approval of Dawson James and Weinstein and delivered copies of these documents to Dawson James and Weinstein for delivery to clients and customers to whom the offer was made to purchase the Convertible Debenture Bonds.

67. The Offering Memorandum disclosed all material facts relating to Neptune and its operations, including financial information, the terms of the First License including ownership, current patent status and future requirements and the use of the anticipated

14

proceeds of the offering, which Dawson James and Weinstein represented would occur with a few weeks.

68. Dawson James and Weinstein were only able to generate four clients as investors in the Convertible Debenture Bonds, who collectively invested a total of $500,000, the minimum required to release the offering proceeds from escrow, by in mid-May, 2006.

69. The use of proceeds in the Offering Memorandum fully disclosed that Neptune required a total of $2,000,000 to undertake the projects described in the Offering Memorandum, and that if only the minimum offering of $500,000 was raised, the net funds received would only support current working capital operating needs of the Neptune and its subsidiaries.

70. The net proceeds of the initial $500,000 received By Neptune was only $435,000, after the fees and other amounts paid to Dawson James, in payment of then past due accounts and was used for current working capital operating expenses, as disclosed in the Offering Memorandum.

71. As a result of the inability to complete the offering of the Convertible Debenture Bonds , a meeting of all the brokers of Dawson James was held at the fish farm operation then managed by Blue Heron Aqua Farms, LLC, to generate further interest in selling the Convertible Debenture Bonds offering to their clients

72. Thereafter, Dawson James was still unable to generate any further interest in the Convertible Debenture Bonds except for very small occasional purchases over the next ten months, all of which, net of Dawson James' commissions and fees, was not sufficient to meet the working capital needs of Neptune and its subsidiaries, as shown in the use of proceeds in the Offering Memorandum.

73.    As a result of this failure, Dawson James and Weinstein demanded that Neptune retain
       Basic Investors, Inc. as another investment bank to assist in the fund raising, at an
       additional, unexpected cost to Neptune.

74.    Neptune later was told by Defendant Fox and by other agents and employees of Dawson
       James that the brokers at Dawson James had been directed by its President Robert Keyser
       not to pursue the Convertible Debenture Bonds offering by Dawson James' management
       to focus on another offering, a fact which was never communicated to and was
       intentionally concealed from Neptune.

75.    In March 2007, a total of $1.7 million was finally raised under the Convertible Debenture
       Bonds offering, bringing the total offering amount over 15 months to $2.7 million. Most
       of these funds were raised through the efforts of Defendant Fox, then a branch manager at
       Dawson James, and brokers under his supervision.

76.    The net proceeds to Neptune, after Dawson James' commissions and fees, from the
       March 2007 placement, was $1,479,000, and was less than the original amount of
       $2,000,000 listed in the use of proceeds in the Offering Memorandum as the amount
       required to undertake the full plan of Neptune developed 15 months earlier when the
       offering commenced, and based on costs and prices then existing, as set forth in the
       Offering Memorandum.

77.    The other funds raised in the offering, after the initial minimum funding in May 2006,
       provided a net amount of $435,000 to Neptune after fees and commissions of Dawson
       James, all of which was used as current working capital as provided in the use of
       proceeds in the Offering Memorandum.

78.   Shortly thereafter, Fox, after having revealed to Neptune's management his intention to leave after having "collected my money" left Dawson James and moved to Newbridge.

79.   Prior to Fox's departure from Dawson James, he approached management of Neptune advising that he was planning to leave and offered to assist Neptune through his new, but yet un-named, employer.

80.   Shortly after his departure, Fox set up a meeting with Newbridge at Newbridge's offices which Neptune management attended. Several other meetings were held between Fox and Neptune management, each of which was for the purpose of attempting to create a relationship between Neptune and Newbridge.

81.   Despite Fox's effort, Neptune honored its remaining contractual obligations to Dawson James under the Placement Agent Agreement and the Consulting Agreement, and never entered into any investment banking arrangement of any kind with Newbridge or Fox.

82.   Although a gross total of $2.7 million was eventually raised in the Convertible Debenture Bonds private offering, more than $1.0 million had been raised in small increments that only allowed the funds to be used to support continuing operations and not to engage in any significant expansion or technology development. This was all explained in the proposed use of proceeds in the Offering Memorandum.

83.   Neptune  later was advised by many of the investors in the Convertible Debenture Bonds offering, including the Convertible Debenture Bond Investors, that they never received the Offering Memorandum from Dawson James and that Dawson James, Weinstein and Fox failed to meet their legal and contractual obligations to deliver a copy of the Offering Memorandum to each person to whom they made the offer to purchase the  Convertible Debenture Bonds, before any purchase was made.

84.    Following the closing of the offering in March 2007, Neptune began discussing the promised second round of financing with Weinstein and the promised "after market" retail support from Dawson James.

85.    Weinstein, Dawson James and Fox had represented to management that the Dawson James retail department would purchase the entire public float for their clients, and Weinstein continually represented that Dawson James was waiting for internal "approval to trade the stock".

86.    This representation was false and fraudulent, and several months later, several Dawson James brokers advised Neptune that they could only participate in unsolicited orders for Neptune common stock and that Dawson James had prevented further involvement in the sale or trading of Neptune stock.

87.    In large part due to the failure of Weinstein, Fox and Dawson James' promised after market support, Weinstein then demanded that Neptune hire "investor relations" experts of his choosing to help create interest in Neptune and its business.

88.    After engaging four such "experts' in serial fashion over the next 24 months, with little success or impact and considerable expense to Neptune, the market price of Neptune common stock continued to drop.

89.    At the time the Convertible debenture Bonds private placement commenced in March 2006, Neptune common shares were trading at $0.35 to $0.44 per share while at the end of the offering in March 2007, the common stock was trading at $0.30 to $0.35. The common stock thereafter has dropped continuously despite the efforts of the "IR experts" demanded by Dawson James, and any buy orders are immediately met with equal or

greater offsetting sell orders, which appear to be coming from Dawson James and Newbridge.

90.    Neptune began receiving complaints from the IR experts and from other shareholders and investors, that Weinstein, Fox, Newbridge and Dawson James were selling Neptune common stock short, manipulating the price of the Neptune common stock and otherwise interfering with the normal free market for Neptune common stock, which Neptune alleges and believes was and remains part of Defendants' scheme, plan, conspiracy and undertaking to destroy the business of Neptune and its subsidiaries and to take the technology and fish farm operations for their own benefit.

91.    In addition to their own sales, short sales and market manipulation to drive the market price of Neptune down, Defendants have been telling other investors and shareholders to sell their Neptune stock because there are unspecified and undisclosed "rumors going around" about Neptune.

92.    Despite Neptune writing a business plan at Weinstein's request for the second round of financing, and then re-writing it and re-writing it again multiple times to meet Weinstein's constantly changing demands, Dawson James and Weinstein failed and refused to undertake the promised and agreed second financing offering, and then began to fabricate the story that Neptune could not be funded unless it "owned" the Aqua-Sphere®, a false story they apparently repeated to their clients and others, despite Neptune's disclosures to the contrary in its business plans, press releases and SEC filings.

93.    During this same period, at the insistence of Weinstein, Neptune hired Weinstein's personal friend, Nancy Alvarez, as a "public relations" consultant.  Neptune resisted this pressure at first but finally agreed after Weinstein proposed that Dawson James pay her

salary out of funds owed by Neptune to Dawson James for the Consulting Agreement imposed on Neptune as part of the Convertible Debenture Bond offering.

94.    Neptune now believes, understands and alleges that Dawson James and Weinstein's' insistence that Neptune hire Alvarez was to insure and to continue an unlawful and improper source of inside information in Neptune for Weinstein and Dawson James.

95.    The continuing false claim from Weinstein and Dawson James that Neptune "owned" the Aqua Sphere® technology, or could not be funded until it did, was further supported and advanced by the appointment of Frank Garafalo to the Neptune Board of Directors in October 2007, at the request and insistence of Weinstein and Dawson James.

96.    After that appointment, Neptune met with Garafalo and an investor associate to discuss a possible additional investment into Neptune.

97.    After many meetings, tours of the operating fish farm and considerable effort by Neptune, Neptune learned that any investment proposal would be conditioned on putting all of the technology, including the Aqua Sphere® technology owned by Papadoyianis and Cherch, into a new entity, that the new investor group including Dawson James then would control all of the technology, and that Garafalo would "manage" that investment.

98.    Shortly thereafter, Neptune first learned that Weinstein had falsely advised certain Neptune shareholders as well as several potential institutional investors that the Aqua-Sphere® technology was "being transferred" to Neptune, that the new Board member, Garafalo, urged on Neptune by Dawson James, was being hired in a senior executive capacity as chief executive of Neptune, and that Neptune was only fundable if these steps were done. None of this was disclosed to or authorized by Neptune, and also was not true.

99.  This false claim from Weinstein and Dawson James that Neptune "owned" the technology, or could not be funded until it did, was never an issue in the more than three year relationship between Neptune and Weinstein, but suddenly became one in March, 2008, allegedly as part of defendants' plan and scheme to take over the business and technology for their own use and benefit.

100. Throughout March, April and May, 2008, Weinstein continued to pressure Neptune to meet his demands, including hiring Garafalo as chief executive officer of Neptune, and even advising Neptune management that they were "stupid" not to do what he said.

101. Finally, faced with continued refusal by Neptune to accept demands that management believed were not in the best interests of the company or its shareholders, Garafalo resigned from the Board of Directors in May 2008.

102. Thereafter, Weinstein continued to propose both bridge and permanent funding, but continued to insist that the Aqua-Sphere® technology be transferred to Neptune.

103. Finally, in June, 2008, the Neptune Board, including the remaining Director designated by Dawson James, unanimously approved the new worldwide technology license of the Aqua-Sphere® technology from the two inventors.

104. As the relationship with Weinstein and Dawson James deteriorated in June and July, 2008, Defendant Fox and Newbridge became more and more insistent on raising funds for Neptune, impliedly from some of the former Dawson James investors who had followed Fox to Newbridge, including other Defendants.

105. The involvement of Fox and Newbridge was a continuation of the on-going conspiracy, plan, scheme and device to destroy the business, technology and prospects of Neptune in

order to take the technology and farming operations of Neptune and its subsidiaries and the Aqua Sphere® technology of Papadoyianis and Cherch, for their own use and benefit.

106. Without the knowledge and consent of Neptune, Fox began the practice of making unscheduled visits to the Blue Heron Aquaculture, Inc. farm operation during 2008, picking up cases of fish gratis for his own consumption, and even bringing or sending potential investors as well as current shareholders, including Defendants Hovnanian, Lee, and others or their representatives, to the farm without the prior approval of or notice to Neptune management.

107. Fox persisted in this practice despite repeated requests from Neptune management that he not do so, and express instructions to Defendant Joubert, then Vice President of Farm Operations of Neptune, that he not permit non-employees to visit the farm without management approval.

108. Management of Neptune explained to both Fox and Joubert that SEC disclosure rules and regulations made it unlawful, improper and illegal for Neptune, as a public company, to disclose or allow the disclosure of non-public information regarding the company and its operations.

109. This unlawful practice by Fox and other defendants of conducting and encouraging secret visits to the farm property continued from mid-2008 through early 2009, in violation of Neptune internal management policies and practices, SEC rules and regulations, and other rights and privileges of Neptune, was aided and abetted by Defendant Joubert, who, while still an officer and employee of Neptune, illegally and unlawfully communicated inside information, corporate information and other material and information to

Defendants in aid of their plans, schemes, devices and conspiracies to take over the farm, technology and business of Neptune.

110. .Although asked repeatedly if Fox and other Defendants or other persons were permitted to visit the farm property secretly, or if he had been in contact with or provided information to Defendants, Joubert repeatedly lied to Neptune management and concealed his illegal and unlawful actions.

111. On information and belief, defendant Joubert, a resident alien permitted to work in the United States solely as a result of Neptune's application for such status as a permitted alien worker, at its expense, has been promised employment, compensation and other benefits by Defendants Hovnanian, Arms' Length Fisheries, LLC and others, as part of their scheme, plan and conspiracy to take the farm operation, technology and other business of Neptune and its subsidiaries for their own personal use and benefit.

112. In January 2009, Neptune management discovered and confirmed the illegal and unlawful actions and conduct of Defendant Joubert, and his deliberate and intentional breaches of his employment agreement with Neptune, including express non-disclosure undertakings, and terminated Joubert's employment for cause.

113. Subsequently, in other proceedings involving Neptune and certain of the Defendants, Defendant's Fox, Weinstein and Lee expressly admit under oath that they have obtained information, secret access to the farm property, and other material, non-public information regarding Neptune and its operations, through and with the cooperation of, Joubert.

114. Management also met with Fox on many occasions during 2008 to provide him with updated information on Neptune, under a confidentiality agreement executed by whom,

allegedly so he could prepare "reports" on Neptune for his clients. Despite these meetings, no such reports were apparently ever done or approved by Neptune, and Neptune received calls and e-mails from Fox's clients asking for updates, all of which was part of what had already been provided to Fox.

115. When Fox later learned that Neptune management had responded directly to these clients, who also are note holders and stockholders of Neptune, Fox became irate and instructed Neptune that it was never to have any direct contact with its own shareholders and note holders, and must only go through Fox.

116. Despite request contact by Neptune management during 2008 with Weinstein and Fox regarding additional funding, including delivering two selling agreements to Dawson James, in the Dawson James format, confirming the prior discussion with Weinstein about a bridge funding and an $8 million institutional funding, Neptune instead was advised by Robert Keyser, a senior executive of Dawson James, and Frank Salvatore, a Dawson James owner or partner, that Dawson James will only do an institutional investor raise, and will not let Neptune fail, because it was planned that "the note holders will take over" the company.

117. During the same period, Fox sent an e-mail dated July 18, 2008 to Neptune management, in which he made false accusations against Neptune of non-cooperation, on the very same issues that management had already addressed with him and met with him face to face over more than once. This falsely accusative e-mail was copied to Dawson James (Frank Salvatore), two Neptune shareholders who were also clients of Fox (Defendants Hovnanian and Lemak), an outside securities attorney, and a then unknown individual, Defendant Carbone.

118.   Subsequently, Fox disclosed that Carbone had been retained as an independent

"consultant" by Newbridge to undertake a "feasibility study" of Neptune as the basis for

additional funding for Neptune from unidentified Newbridge clients.

119.   On the basis of Fox and Newbridge's representations and promise of additional funding,

a meeting was arranged with Neptune's then CFO to discuss issues on a list of questions

provided by Fox (which were the same issues previously addressed with Fox by Neptune

management on several occasions).

120.   Due to SEC Regulation FD concerns, both Carbone and Fox were required to sign

confidentiality and non-disclosure agreements, which restricted any use or disclosure of

non-public information unless the disclosee also signed a similar agreement with

Neptune.

121.   Simultaneously, Neptune received a call from another shareholder/note holder

complaining that he had been called by Fox who advised him that he (Fox) has

investment funds for Neptune but that Neptune would not communicate with him. \

122.   Fox then issued another e-mail threatening Neptune management unless a meeting was

held immediately with Carbone, a meeting which was already scheduled for August 8,

2008, and which Fox himself attended to obtain information for Carbone's "investment

feasibility study".

123.   All of the information requested was either then provided or promised, but, as the

additional information was being provided to Carbone, Fox sent another threatening e-

mail to Neptune, demanding a meeting with Carbone and him at the farm operation in

Florida City on Friday, August 16, 2008.

124.    On August 19, 2008, Fox again demanded a meeting at the farm for Friday, and again
threatened negative consequences if his demands were not met.  Since the farm property
was in the direct path of Tropical Storm Fay that week, and a visit that week would be
disruptive, Neptune again suggested a meeting in a more convenient location.

125.    This suggestion was quickly followed by another threatening e-mail from Fox dated
August 20, 2008, titled "Notice of Action' and containing false charges and threats of
communicating these false charges to note holders and shareholders of Neptune if Fox's
demands were not met immediately.

126.    Thereafter, Neptune management continued a dialogue with Defendant Carbone and
Defendant Southeastern Associates, which gradually changed its represented position as a
consultant retained by Newbridge and Fox, to "representing" certain investors, including
Defendants Hovnanian, Lee, Lemak,  and Sandor.

127.    Thereafter, Defendant Carbone, acting on behalf of Defendants, issued a series of
irrational and bizarre demands by e-mail to Neptune, including that Neptune's executive
officers resign in favor of Carbone, as interim manager, that the farm property be
transferred to Hovnanian and others, that the Aqua Sphere® technology owned by
Papadoyianis and Cherch be transferred to Neptune, and that all salaries, benefits and
other compensation of Neptune management for an unspecified period be returned,
following which, Defendants then would determine if additional investment in Neptune
would be made.

128.    The demands communicated by Carbone were further manifestations of the schemes,
plans and devices to defraud, and conspiracy of Defendants to destroy and take over the

business and assets of Neptune and its subsidiaries for their own use and benefit and to the loss and damage of Plaintiffs.

129.   The actions and conduct of Fox and Newbridge, which were communicated to and joined in by Weinstein and Dawson James and other Defendants, were in furtherance of Defendants' conspiracy, intimidation, and acts and conduct intending to facilitate their fraudulent scheme to take over the farm operation, technology and business of Neptune for their own use and benefit.

130.   As an immediate consequence of the actions of Defendants Fox, Weinstein, Newbridge and Dawson James, Neptune filed a formal complaint with the Financial Industry Regulatory Authority (FINRA) the self-regulatory agency governing conduct of registered broker dealers, and FINRA on information and belief is engaged in an on-going investigation as a result.

131.   The FINRA complaint, and the further conspiracy, plan, scheme and artifice to defraud as alleged against Defendants in this Complaint, includes that

   a.   There has been an apparent plan to drive down the price of Neptune stock, below the $0.30 per share conversion price of the Convertible Debenture Bonds, so that Neptune will be pressured if it is unable to pay off the notes when they come due and will be forced to turn over control of the Aqua-Sphere® and Ento Protein® technologies to Dawson James and Newbridge and the other Defendants.

   b.   The same alleged plan also contemplates replacing executive management of Neptune with management chosen by Dawson James ,Newbridge, and the other Defendants presumably including Defendants Joubert and Carbone, which creates a serious conflict of interest.

c.  Brokers at Dawson James who represented that they had investors willing and ready to invest in Neptune, up to at least $1 million, were advised by Dawson James that they could not do so and were not to discuss this with Neptune.

d.  Investors are now being advised by Dawson James, and presumably by Newbridge, that Neptune is unfundable and that the investors should sell all of their shares in Neptune.

e.  Investors are now being advised by Dawson James, and presumably by Newbridge, that "rumors are going around" about Neptune, but the nature of the rumors is not disclosed.

f.  The stock price of Neptune common stock has dropped from $0.35 to $0.40 per share when Dawson James first became involved, to $0.20 when Newbridge began demanding meetings in July 2008 to prepare the "investment feasibility study" to the current price of less than $0.03 per share.  Since most of the public float in Neptune stock is controlled by Dawson James and Newbridge, this decline is part of the Defendants' plan to pressure Neptune into giving up control of its technology and management to them, At the same time, Dawson James and its agents, including Weinstein, as well as Tom Fox have all cleared shares received by them as compensation for the private placement in 2006 and 2007, and have placed then into the market, as further downward pressure on Neptune's stock.

g.  Defendants have continuously misled and misrepresented facts to both Neptune and to investors placed into Neptune by them.

132.  Neptune continued to actively negotiate with other unrelated investors regarding major investments in Neptune, which Defendants have conspired to prevent and disrupt in order to continue their plan and scheme to acquire control of the technology and management of Neptune.

## FIRST CAUSE OF ACTION

133.   Paragraphs 1 through 132 of the Complaint are incorporated and re-alleged.

134.   Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b) makes it unlawful for any person, directly or indirectly, by means of any instrumentality of interstate commerce to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device in contravention of the rules and regulations of the SEC.

135.   SEC Rule 10b-5, 17 C.F.R. §240.105-5, issued under Section 10(b), makes it unlawful for any person, in connection with the purchase or sale of a security, to misrepresent or omit a material fact related to the purchase or sale of the security.

136.   Defendants, using telephone, facsimile, wire transfers another means and instrumentalities of interstate commerce, have engaged in material misrepresentations and omissions of material fact in connection with the sale and purchases of the Convertible Debenture Bonds of Neptune by Defendants, including the plan, scheme devices and conspiracy to destroy the market price of Neptune common stock, and to destroy the business of Neptune and its subsidiaries so Defendants can take over the business and technology of Neptune.

137.   Defendants' actions have caused loss, damage and injury to Plaintiffs as a direct and proximate result of Defendants misconduct, which Defendants intended Plaintiffs to rely on and which they reasonably relied on to their detriment.

138.   As a result of Defendants' actions and conduct in violation of Section 10(b) and Rule 10b-5, Plaintiffs have been injured in an amount not less than $5,000,000 each.

139. Plaintiffs are entitled to recover their actual damages from Defendants and also to have an order entered canceling the Convertible Debenture Bonds obtained by Defendants Lee, Sandor, Hovnanian and Landahl, all common stock of Neptune issued to Defendants as interest, fees or compensation and all warrants to acquire shares of Neptune common stock held by Defendants, ab initio, as obtained by fraud, misrepresentation or omission.

## SECOND CAUSE OF ACTION

140. Paragraphs 1 through 139 of the Complaint are incorporated and re-alleged.

141. The acts, transaction and conduct of Defendants as herein alleged constitute civil fraud under the laws of the State of Florida.

142. As a result of Defendants' actions and conduct in violation in fraud of Plaintiffs, Plaintiffs have been injured in an amount not less than $5,000,000.

143. Plaintiffs are entitled to recover their actual damages from Defendants and also to have an order entered canceling the Convertible Debenture Bonds obtained by Defendants Lee, Sandor, Hovnanian and Landahl, all common stock of Neptune issued to Defendants as interest, fees or compensation and all warrants to acquire shares of Neptune common stock held by Defendants, ab initio, as obtained by fraud, misrepresentation or omission.

## THIRD CAUSE OF ACTION

144. Paragraphs 1 through 143 of the Complaint are incorporated and re-alleged.

145. Defendants Fox, Weinstein, Newbridge, and Dawson James, with the advice and assistance of the other Defendants, have engaged in market manipulation, and illegal and unlawful stock activity in violation of the Securities & Exchange Act of 1934 and in violation of their fiduciary duty to Plaintiffs, resulting in the loss and damage to Plaintiffs from the loss in value of their investments in Neptune, and the inability of Neptune to

raise additional funding due to Defendants' short selling, market manipulation and related activities..

146. As a result of Defendants' actions and conduct in violation in fraud of Plaintiffs, Plaintiffs have been injured in an amount not less than $5,000,000.

147. Plaintiffs are entitled to recover their actual damages from Defendants.

## FOURTH CAUSE OF ACTION

148. Paragraphs 1 through 147 of the Complaint are incorporated and re-alleged.

149. Defendants have engaged in intentional interference with contractual and business relations of Neptune, by interfering with and subverting Neptune' s employer and employee relationship with  Defendant Joubert, to the loss and detriment of Neptune.

150. Neptune is entitled to recover its actual damages from Defendants' intentional and deliberate interference with its contractual and business relations, in an amount to be determined at trial, but not less than $1,000,000.

151. Neptune is also entitled to recover exemplary damages against Defendants for the intentional and willful misconduct of Defendants, in an amount of not less than $1,000,000.

## FIFTH CAUSE OF ACTION

152. Paragraphs 1 through 151of the Complaint are incorporated and re-alleged.

153. Defendants have engaged in intentional inducement to breach of contract by causing, encouraging and participating in the breach of his employment contract and contract not to disclose confidential information of Neptune by Defendant Joubert, through moneys, offers, bribes, promises and misrepresentations.

154.    Neptune is entitled to recover its actual damages from Defendants' intentional and deliberate inducement to breach of Neptune's employment contract by Defendant Joubert, in an amount to be determined at trial, but not less than $500,000.

155.    Neptune is also entitled to recover exemplary damages against Defendants for the intentional and willful misconduct of Defendants, in an amount of not less than $1,000,000.

## SIXTH CAUSE OF ACTION

156.    Paragraphs 1 through 155 of the Complaint are incorporated and re-alleged.

157.    Defendant Joubert intentionally and willfully breached and violated his employment agreement with Neptune and the confidentiality agreement therein.

158.    Neptune properly terminated Defendant Joubert's employment with Neptune for cause as a result of Joubert's misconduct and breach of his employment agreement.

159.    Neptune expended approximately $15,000 in legal and related fees to support Defendant Joubert's application for permanent residency in the United States, for which Neptune is entitled to reimbursement as a result of Joubert's intentional breach of contract.

160.    Neptune is entitled to recover the sum of $15,000 from Joubert for Joubert's breach of contract as recover of the amounts expended in support of Joubert's permanent residence application.

161.    Neptune is also entitled to recover damages reasonably resulting from Jounert's intentional breach of contract as a result of his illegal and unlawful disclosure of confidential, non-public information of Neptune to other Defendants, in an amount to be determined at trial, but not less than $1,000,000.

## SEVENTH CAUSE OF ACTION

162.   Paragraphs 1 through 161 of the Complaint are incorporated and re-alleged.

163.   Defendants have executed confidentiality agreements with Neptune undertaking and agreeing to preserve, protect and not disclose or use other than for the benefit of Neptune, any and all confidential information, or have received information under a duty of confidentiality, which they have used themselves or disclosed to others to the detriment of Neptune.

164.   Defendants have breached the contractual promises of confidentiality and Neptune is entitled to contract damages resulting from each Defendants' breach of contract, in an amount to be determined at trial, but not less than $1,000,000 from each Defendant.

165.   Neptune is also entitled to temporary, interlocutory and permanent injunctive relief restraining and enjoining Defendants from using, disclosing, or otherwise benefitting from any and all confidential information obtained by all or any of them from or through Neptune.

## EIGHTH CAUSE OF ACTION

166.   Paragraphs 1 through 166 of the Complaint are incorporated and re-alleged.

167.   Regulation FD issued by the SEC under the provisions of the Securities & Exchange Act of 1934 prevents and precludes an issuer and any other person from disclosing or using any non-public, material information of or relating to a public company such as Neptune, unless such information is equally available to all public investors.

168.   Defendants, through plans, schemes and artifices to defraud, and in violation of Rile 10b-5 and Regulation FD, have illegally and unlawfully obtained, disclosed  and used

non-public material information relating to Neptune for their own benefit, when such information is not and has not been available to the investing public.

169. Neptune is entitled to recover damages resulting from each Defendants' violation and misconduct under Rule 10b-5 and Regulation FD, in an amount to be determined at trial, but not less than $1,000,000 from each Defendant.

170. Neptune is also entitled to temporary, interlocutory and permanent injunctive relief restraining and enjoining Defendants from using, disclosing, or otherwise benefitting from any and all confidential information obtained by all or any of them from or through Neptune in further violation of Rule 10b-5 and Regulation FD.

### NINTH CAUSE OF ACTION

171. Paragraphs 1 through 170 of the Complaint are incorporated and re-alleged.

172. Defendants have engaged in intentional and willful disparagement of the business and prospects of Neptune under Florida law.

173. Neptune is entitled to recover damages for Defendants' willful and intentional business disparagement of Neptune and its prospects and business in an amount to be determined at trial, but not less than $1,000,000 from each Defendant.

174. Neptune is also entitled to recover exemplary damages against Defendants for the intentional and willful misconduct of Defendants, in an amount of not less than $1,000,000 from each Defendant.

### TENTH CAUSE OF ACTION

175. Paragraphs 1 through 174 of the Complaint are incorporated and re-alleged.

176. Defendants have engaged in libel and slander regarding Plaintiffs Papadoyianis and Cherch by intentionally, willfully, and with malice, both orally an in writing,

34

communicated and published to third parties, including alleging and claiming that Papadoyianis and Cherch have engaged in self-dealing and have acted incompetently or negligently in their roles as officers and directors of Neptune.

177.   Papadoyianis and Cherch are entitled to recover actual damages for the libel and slander of Defendants, jointly and severally, in amounts to be determined at trial but not less than $1,000,000 to each from each Defendant.

178.   Papadoyianis and Cherch are each also entitled to recover exemplary damages against Defendants for the intentional and willful libel and slander of Defendants, in an amount of not less than $1,000,000 each from each Defendant.

ELEVENTH CAUSE OF ACTION

179.   Paragraphs 1 through 178 of the Complaint are incorporated and re-alleged.

180.   Each of the Convertible Debenture Investors invested in Neptune in good faith and with the expectation and understanding that Defendants Fox, Weinstein, and Dawson James would act in good faith in accordance with their legal and fiduciary obligations to the Convertible Debenture Investors.

181.   Each of the Convertible Note Investors invested in Neptune in good faith and with the expectation and understanding that there would be no unlawful market manipulation, short selling, or other actions, plans, schemes and undertakings to destroy the value of the convertible notes and investment in Neptune.

182.   Without the knowledge or consent of the Convertible Debenture Investors and the Convertible Note Investors, Defendants entered into a conspiracy and plan, scheme and design to destroy the business and prospects of Neptune and to take the business,

technology and prospects of Neptune for their own use, in violation of their duties and obligations to the Convertible Debenture Investors and the Convertible Note Investors.

183. The acts, conducts and fraud of Weinstein, Fox and Dawson James is a violation of the Securities Exchange act of 1934, including Section 10(b) and Rule 10b-5 thereunder, as well as the Investment Advisers Act of 1940, and each of the Convertible Debenture Investors and the Convertible Note Investors is entitled to recover from Defendants Fox, Weinstein and Dawson James damages equal to the amount of each Convertible Debenture Investor's and the Convertible Note Investors' investment in Neptune plus interest thereon at the agreed rate of interest until paid.

184. The Convertible Debenture Investors and the Convertible Note Investors are each also entitled to recover exemplary damages against Defendants Fox, Weinstein and Dawson James and the other Defendants for their intentional and misconduct of Defendants, in an amount of not less than $1,000,000 each from each Defendant.

## TWELFTH CAUSE OF ACTION

185. Paragraphs 1 through 184 of the Complaint are incorporated and re-alleged.

186. Each of the Convertible Debenture Investors invested in Neptune in good faith and with the expectation and understanding that Defendants Fox, Weinstein, and Dawson James would act in good faith in accordance with their legal and fiduciary obligations to the Convertible Debenture Investors.

187. Each of the Convertible Note Investors invested in Neptune in good faith and with the expectation and understanding that there would be no unlawful market manipulation, short selling, or other actions, plans, schemes and undertakings to destroy the value of the convertible notes and investment in Neptune.

188.     Without the knowledge or consent of the Convertible Debenture Investors and the Convertible Note Investors, Defendants entered into a conspiracy and plan, scheme and design to destroy the business and prospects of Neptune and to take the business, technology and prospects of Neptune for their own use, in violation of their duties and obligations to the Convertible Debenture Investors and the Convertible Note Investors.

189.     The acts, conducts and fraud of Weinstein, Fox and Dawson James constitutes civil fraud under the laws of the State of Florida, and each of the Convertible Debenture Investors and the Convertible Note Investors is entitled to recover from Defendants Fox, Weinstein and Dawson James damages equal to the amount of each Convertible Debenture Investor's and the Convertible Note Investors' investment in Neptune plus interest thereon at the debenture rate of 24 percent per annum until paid.

190.     The Convertible Debenture Investors and the Convertible Note Investors are each also entitled to recover exemplary damages against Defendants Fox, Weinstein and Dawson James and the other Defendants for their intentional and misconduct of Defendants, in an amount of not less than $1,000,000 each from each Defendant.

## THIRTEENTH CAUSE OF ACTION

191.     Paragraphs 1 through 190 of the Complaint are incorporated and re-alleged.

192.     Defendants have secretly and illegally trespassed on the property of Neptune and its subsidiaries, including secret repeated visits to the farm property managed by Blue Heron Aquaculture, Inc., despite frequent and numerous requests to refrain from doing so.

193.     Neptune is entitled to a temporary, interlocutory and permanent injunction barring Defendants and each of them from trespassing or otherwise entering onto the property of

Neptune or any subsidiary of Neptune, including the fish farm located in Florida City, Florida

## FOURTEENTH CAUSE OF ACTION

194. Paragraphs 1 through 193 of the Complaint are incorporated and re-alleged.

195. Defendants have claimed and continue to claim falsely and fraudulently that Neptune has ownership of or a claim to the Aqua Sphere® technology invented and owned by Plaintiffs Papadoyianis and Cherch, which claim is in aid of Defendants conspiracy, scheme and plan to steal and take the assets and business of Neptune and the Aqua Sphere® technology for their own use and benefit.

196. The claims and demands of Defendants relating to the Aqua Sphere® technology represents and creates a cloud on the title to and ownership of the technology, and represents a disputed claim of ownership, use and rights to the Aqua Sphere® technology.

197. Plaintiffs Papadoyianis and Cherch, with the support of Plaintiff Neptune, seeks a declaratory judgment that Papadoyianis and Cherch are the sole owners of the Aqua Sphere® technology. And all patents, patent applications, know-how, drawings, trade names, materials and other items related to and based on the Aqua Sphere® technology, to the exclusion of Defendants and any other party.

## FIFTEENTH CAUSE OF ACTION

198. Paragraphs 1 through 197 of the Complaint are incorporated and re-alleged.

199. The acts, transactions and conducts of Defendants represent and constitute a criminal enterprise within the meaning of the 18 USC 1962.

200. The Defendants did unlawfully, knowingly ans intentionally acquire and maintain, directly and indirectly an interest in and control of the forementioned enterprise which was engaged in and the activities of which effected interstate and foreign commerce, through a pattern of racketeering activities as described in the foregoing paragraphs.

201. The Defendants received money or other financial gain from the pattern of racketeering activities

202. The Defendants have invested money in the enterprise.

203. At various times and places enumerated in the complaint, the Defendants did conspire to acquire and maintain an interest in a RICO enterprise.

204. The Defendants did commit two (2) or more of the offenses itemized above in the complaint in a manner which they calculated and premeditated intentional to threaten continuity.

WHEREFORE, having fully set forth their claims against Defendants, Plaintiffs demand that judgment be entered in their favor as follows:

1. On the First Cause of Action, damages in favor of each Plaintiff and against each of the Defendants in an amount to be determined at trial, but not less than $5,000,000 each, plus the cancellation of the Convertible Debenture Bonds held by Defendants Lee, Landahl, Sandor and Hovnanian, the cancellation of all shares of common stock of Neptune issued to any of the Defendants as interest, compensation or fees, and all warrants to purchase common stock of Neptune held by any Defendant.

2. On the Second Cause of Action, damages in favor of each Plaintiff and against each of the Defendants in an amount to be determined at trial, but not less than $5,000,000 each.

3. On the Third Cause of Action, damages in favor of each Plaintiff and against each of the Defendants in an amount to be determined at trial, but not less than $5,000,000 each.

4. On the Fourth Cause of Action, damages in favor of Plaintiff Neptune and against each of the Defendants in an amount to be determined at trial, but not less than $1,000,000, plus exemplary damages., plus exemplary damages.

5. On the Fifth Cause of Action, damages in favor of each Plaintiff Neptune and against each of the Defendants in an amount to be determined at trial, but not less than $500,000, plus exemplary damages.

6. On the Sixth Cause of Action, damages in favor of Neptune and against Defendant Joubert in an amount to be determined at trial but not less than $1,015,000, plus exemplary damages.

7. On the Seventh Cause of Action, damages in favor of Plaintiff Neptune and against each of the Defendants in an amount to be determined at trial, but not less than $1,000,000.

8. On the Eighth Cause of Action, damages in favor of Plaintiff Neptune and against each of the Defendants in an amount to be determined at trial, but not less than $1,000,000., plus a temporary, interlocutory and permanent injunction against Defendants.

9. On the Ninth Cause of Action, damages in favor of Plaintiff Neptune and against each of the Defendants in an amount to be determined at trial, but not less than $1,000,000, plus exemplary damages.

10. On the Tenth Cause of Action, damages in favor of Plaintiffs Papadoyianis and Cherch and against each Defendant in an amount to be determined at trial, but not less than $1,000,000 each, plus exemplary damages.

11. On the Eleventh Cause of Action, damages in favor of each of the Convertible Debenture Investors and the Convertible Note Investors amount of the original investment of each, plus interest and exemplary damages.

12. On the Twelfth Cause of Action, damages in favor of each of the Convertible Debenture Investors and the Convertible Note Investors in the amount of the original investment of each, plus interest and exemplary damages.

13. On the Thirteenth Cause of Action, for entry of an order granting an injunction in favor of Neptune and against all Defendants.

14. On the Fourteenth Cause of Action, for declaratory judgment relief in favor of Plaintiffs Papadoyianis and Cherch that they are and remain the sole owners of the Aqua Sphere® technology and all related names, assets and property.

15. On the Fifteenth Cause of Action, damages in favor of all Plaintiffs and against all Defendants in an amount to be determined at trial, but not less than $2,000,000 each against each Defendant, and with all such damages as so determined thereafter tripled.

16. Against all Defendants, an award of all costs of this action as well as recovery of attorneys' fees, in amounts to be determined.

Respectfully submitted,

Daise & Associates P.A.

3900 West Flagler Street

Miami, FL 33134

(786) 999-6472

Kimberly S. Daise, esquire
Florida Bar No. 813532

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)  **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS
Neptune Industries, Inc.

## DEFENDANTS
Armen Hovnanian

**(b)** County of Residence of First Listed Plaintiff  **West Palm Beach**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  **Broward**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Kimberly S. Daise
3900 W. Flagler St, Coral Gables, FL 33134
(786) 999-6472

Attorneys (If Known)

FILED by D.C.

FEB 25 2009

STEVEN M. LARIMORE
CLERK U.S. DIST CT.
S. D. OF FLA. - MIAMI

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE   ☐ MONROE   ☐ BROWARD   ☑ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE   ☐ HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

WPB 09 CV 80297 - Marra / Johnson

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                       and One Box for Defendant)

|                              | PTF | DEF |                                                      | PTF | DEF |
|------------------------------|-----|-----|------------------------------------------------------|-----|-----|
| Citizen of This State        | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State     | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation                            | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt. Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | ☐ 950 Constitutionality of State |
| | Employment | ☐ 550 Civil Rights | Application | | Statutes |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus-Alien | | |
| | Other | | Detainee | | |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case  ☐ YES ☑ NO          b) Related Cases  ☐ YES ☑ NO

JUDGE                           DOCKET NUMBER

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

Securities Exchange Act

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☑ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD   *Kimberly S Daise*

DATE

FOR OFFICE USE ONLY

AMOUNT $350.00   RECEIPT # 995739

02/25/09